RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0159p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CLARENCE D. SCHREANE,

*Petitioner-Appellant,*

No. 15-6141

*v.*

DAVID EBBERT, Warden,

*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:13-cv-00190—Harry S. Mattice Jr., District Judge.

Argued: June 21, 2017

Decided and Filed: July 20, 2017

Before: SILER, CLAY, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Zenaida R. Lockard, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Michael M. Stahl, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Michael M. Stahl, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

SILER, J., delivered the opinion of the court in which CLAY and McKEAGUE, JJ., joined. CLAY, J. (pp. 11–12), delivered a separate concurring opinion.

---

**OPINION**

---

SILER, Circuit Judge.   Clarence D. Schreane seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Specifically, Schreane argues that the police violated his Fifth Amendment rights when they denied his request for an attorney while being questioned at the police station. In the alternative, Schreane argues that the police officers' promises of leniency also made his confession involuntary.  Due to the proper deference afforded to the state court, we affirm the district court's denial of Schreane's writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

The following factual background is taken from the Tennessee Court of Criminal Appeals' ("TCCA") opinion on direct appeal of Schreane's conviction:

> This case relates to the defendant's participation in the killing of Marcus Edwards on September 19, 1991.  The Chattanooga Police Department investigated the murder; however, the case went cold and remained unsolved for eight years.  In 1999, the defendant was incarcerated on unrelated charges when he contacted Chattanooga Police Department detectives and told them he had information related to the unsolved 1991 murder.  The detectives had the defendant brought to their location to speak with him, and after a period of a few hours, the defendant confessed.
>
> At the trial, the evidence showed that the defendant accompanied Charles Turner to the victim's place of business to help Mr. Turner commit a robbery.  As the victim was talking to Mr. Turner, the defendant struck the victim with a rock, and Mr. Turner then shot the victim with a .38 caliber handgun.  Mr. Turner took the victim's .357 magnum handgun, which was on the victim's body.  Mr. Turner also took a cigar box containing cash and gave the defendant one hundred dollars as both men fled the scene in the defendant's 1983 Cadillac Eldorado.
>
> Before the trial, the defendant filed a motion to suppress his confession, arguing that it was taken in violation of his Fifth and Fourteenth Amendment rights.  At the motion to suppress hearing, Chattanooga Police Department Detective Mike Mathis testified that he was the lead investigator for the 1991 murder.  He said the victim was shot to death and found in his business.  Detective Mathis said few solid leads developed until the defendant contacted them.

Detective Mathis said that sometime before September 19, 1999, Chattanooga Police Department Lieutenant Steve Angel had been receiving collect telephone calls from the Hamilton County Jail, which he was unable to answer. He said that the defendant's "significant other" contacted the detectives and told them the defendant wanted to talk to them about an unsolved murder. He said the defendant also called and spoke with Lt. Angel and told him enough specific information about the murder to cause Lt. Angel to have the defendant transported from the Hamilton County Jail to the police service center.

Detective Mathis said he conducted an interview with the defendant, culminating in a tape-recorded statement. He said that although the defendant was in custody on unrelated charges, he was not under arrest or charged with the victim's murder when he confessed. Detective Mathis said he did not promise the defendant anything in return for his confession. Detective Mathis said the defendant waived his constitutional right to remain silent and to an attorney before making the tape-recorded statement.

On cross-examination, Det. Mathis said he talked with the defendant for some period of time before reading him his *Miranda* rights. He admitted that before he arrived to interview the defendant, Lt. Angel had been talking to the defendant. Detective Mathis said that although he did not promise the defendant anything specific in return for his confession, he did explain to the defendant that he would tell the district attorney general's office that the defendant had come forward on his own and cooperated with the police. Detective Mathis admitted that he may have told the defendant he would try to help transport the defendant from the Hamilton County Jail to Silverdale, a state correctional facility.

On redirect examination, Det. Mathis said the defendant initiated the contact with the police department. Detective Mathis explained that the reason for the delay in reading the defendant his *Miranda* rights was the defendant initially maintained that he had only heard about the murder, not that he had any involvement in it. He said the defendant ultimately "came clean" and confessed.

The defendant testified that when he first arrived at the police service center, he was placed in an interview room with Det. Carroll and Det. Mathis. He said Lt. Angel entered the room later. The defendant said Det. Mathis told him he believed "the bicycle bandit" was responsible for the victim's murder. The defendant said that he then asked to speak with his attorney but that Det. Mathis told him he did not need an attorney. The defendant said Det. Mathis made promises to him before the taping began. He said Det. Mathis promised him that the defendant would not be charged with the murder, that Det. Mathis would speak with the defendant's parole officer in another case, and that Det. Mathis would speak with the district attorney general's office in order to have them dismiss certain charges against the defendant from another case in return for the defendant's cooperation. He said Det. Mathis also promised to transfer him from

the Hamilton County Jail to Silverdale.  The defendant said he was transferred to Silverdale two days later.  The defendant said he did not sign the waiver form until after the taped statement was made.

*State v. Schreane*, No. E2005-00520-CCA-R3CD, 2006 WL 891394, at *1–2 (Tenn. Crim. App. Apr. 5, 2006), *perm. app. denied* (Aug. 28, 2006).

A jury convicted Schreane of first degree felony murder and aggravated robbery, for which he received consecutive sentences of life imprisonment and sixty years of incarceration, respectively. *Id.* at *1.  Schreane's convictions were affirmed on direct appeal by the TCCA, and the Tennessee Supreme Court ("TSC") denied permission to appeal.  *Id.*

The trial court denied Schreane's petition for post-conviction relief, the TCCA affirmed this denial, and the TSC denied permission to appeal.  *Schreane v. State*, No. E2009-01103-CCA-R3-PC, 2010 WL 3919264 (Tenn. Crim. App. Oct. 7, 2010), *perm app. denied* (Jan. 18, 2011).

After post-conviction relief was denied, Schreane filed a petition for writ of error coram nobis, which the trial court denied.  The TCCA affirmed this denial, and the TSC denied permission to appeal.  *Schreane v. State*, No. E2012-01202-CCA-R3-PC, 2013 WL 173193 (Tenn. Crim. App. Jan. 16, 2013), *perm. app. denied* (May 7, 2013), *petition to rehear denied* (June 4, 2013).

Schreane then filed a motion to reopen his post-conviction proceedings, which the trial court alternatively construed as another petition for a writ of error coram nobis.  The trial court denied this motion, the TCCA affirmed the denial, and the TSC denied permission to appeal.  *Schreane v. State*, No. E2012-00954-CCA-R3-CO, 2013 WL 5516430 (Tenn. Crim. App. Oct. 2, 2013), *perm. app. denied* (Oct. 2, 2013).  Schreane also filed a motion to dismiss his indictment in the trial court, which the trial court construed as a petition for state habeas relief.  This petition was denied, and the TCCA affirmed on appeal.  *Schreane v. State*, No. E2013-1161-CCA-R3-HC, 2013 WL 62295227 (Tenn. Crim. App. Dec. 2, 2013).

Schreane then filed two petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The district court denied Schreane's requests for relief but granted a certificate of

appealability ("COA") on one issue: whether Schreane's confession should have been excluded from trial due to the denial of his request for counsel and the length of time he was questioned before police informed him of his *Miranda* rights. We denied Schreane's request to expand this COA and limited this appeal to that single issue.

## STANDARD OF REVIEW AND LEGAL STANDARD

We review de novo a district court's decision to deny a writ of habeas corpus. *Mendoza v. Berghuis*, 544 F.3d 650, 652 (6th Cir. 2008). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. § 2254, a court considering a habeas claim must defer to any decision by a state court concerning the claim, unless the state court's judgment: (1) resulted in a decision that was contrary to clearly established federal law as determined by the United States Supreme Court; (2) involved unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (3) was based on an unreasonable determination of the facts in light of the evidence presented in the state court. 28 U.S.C. § 2254(d)(1), (2).

In *Williams v. Taylor*, the Court explained that this analysis involves a two-part inquiry: first, whether the state court correctly identified the governing legal rule; and second, whether the state court applied that rule in an objectively reasonable way to the facts of the prisoner's case. 529 U.S. 362, 404 (2000).

## DISCUSSION

### I.      Fifth Amendment Right to Counsel/*Miranda*

Schreane argues that "once he requested counsel, officers should have ended their interrogation of him." According to Schreane, "this failure rendered his subsequent confession inadmissible." Appellant Br. 10. Specifically, Schreane argues that *Miranda* "require[s] police officers to cease questioning a suspect who unequivocally invokes his right to counsel [and] [p]olice cannot use statements made after the suspect requests counsel if those subsequent statements are the result of further police-initiated interrogation." *McKinney v. Hoffner*, 830 F.3d 363, 370 (6th Cir. 2016).

In response, the State argues that because Schreane was not "in custody" for *Miranda* purposes, the police officers were not required to provide an attorney. *See United States v. Malcolm*, 435 F. App'x 417, 420 (6th Cir. 2011) (finding that a suspect who mentioned speaking to counsel was not "in custody" for *Miranda* purposes and was therefore not entitled to counsel under *Miranda*); *see also Edwards v. Arizona*, 451 U.S. 477, 485–86 (1981) (holding that there is no infringement of the right to counsel absent custodial interrogation).

### a. Correct Legal Rule

As the Court explained in *Williams*, the threshold inquiry is whether the state court correctly identified the governing legal rule. The Fifth Amendment guarantees that an individual has the right not to be "compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The "clearly established" federal law applicable to petitioner's claim is set out in *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Court held that a suspect must be informed of his Fifth Amendment right against self-incrimination, among other rights, prior to custodial interrogation by police. *Id.* at 444. To determine whether custodial interrogation exists, the Court defined the term as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* However, the Court has clarified that questioning initiated by the accused is not interrogation for *Miranda* purposes. *Edwards*, 451 U.S. at 484.

In this case, the state court correctly identified the legal rule by stating that "the record does not reflect that [Schreane] was under custodial interrogation before the police read him the *Miranda* warnings and obtained his waiver of rights." *Schreane*, 2010 WL 3919264, at *9.

### b. Objectively Reasonable Adjudication

After ensuring that the correct legal rule was used, we turn to whether the state court's adjudication of the claim was objectively reasonable. In *Williams*, the Supreme Court distinguished between an "incorrect or erroneous application" of federal law and an "unreasonable application" of federal law. 529 U.S. at 410. The focus of the review, according to the Supreme Court, is not whether the federal court would find a constitutional violation if presented with a factual scenario identical to that in the state court, but the reasonableness of the

state court's decision in light of the evidence before it. *Cullen v. Pinholster*, 563 U.S. 170, 184–85 (2011).

In finding that Schreane's Fifth Amendment rights were not violated, the state court relied on the fact that Schreane initiated contact with police to find that he was not subjected to custodial interrogation when he requested an attorney. *See State v. Schreane*, No- E2005-00520-CCA-R3CD, 2006 WL 891394, at *4–5 (Apr. 5, 2006) ("The record reflects that the defendant initiated the questioning in this case by voluntarily seeking out the detectives and speaking to them concerning the victim's murder. In this regard, we conclude the record does not reflect that the defendant was under custodial interrogation before the police read him the *Miranda* warnings and obtained his waiver of rights. The defendant is not entitled to relief on this issue."); *see also State v. Schreane*, No-E2009-01103-CCA-R3-PC, 2010 WL 3919264 (Oct. 7, 2010) ("The record reflects that the Petitioner initiated the questioning in this case by voluntarily seeking out the detectives and speaking to them concerning the victim's murder. As a result, the Petitioner was not subject to custodial interrogation when he initiated communication with the detectives.").[1]

While it is correct that suspect-initiated contact with the police is not custody for *Miranda* purposes, *see Edwards*, 451 U.S. at 484, our analysis should not stop there as a few issues must be resolved in this case. First, it must be determined whether the state court's determination that Schreane initiated the contact with police was an unreasonable determination of the facts as presented to the state court. In his § 2254 petition, Schreane asserts that he did not make any calls to police. However, this assertion is in direct contradiction with the evidence in state court. In testimony to the trial court at both the pretrial suppression hearing and at the post-conviction hearing, Schreane stated that, although someone else initially contacted the police on his behalf, he made the call to the police on the day he was taken to the police station for questioning. Schreane also stated in his memorandum in support of his petition for post-conviction relief that he initiated contact with police to discuss the murder. Therefore, it was not

---

[1]The district court relied on the 2006 state court opinion. There is an argument that the 2010 state court opinion is "the last reasoned state-court opinion." *Yist v. Nunnemaker*, 501 U.S. 797, 804–05 (1991). However, both opinions rely on the same reasoning and were used interchangeably in the parties' briefs. Therefore, reliance on either case does not change the analysis.

an unreasonable determination of the facts for the state court to conclude that Schreane originally initiated the contact with the police prior to questioning.

Second, the completeness of the state court's decision must be examined. As the district court noted, the state court did not analyze whether Schreane's request to confer with counsel represented Schreane's withdrawing his initiation of the discussion. Furthermore, the state court did not analyze whether Schreane's request for counsel supports a finding that the police, rather than Schreane, initiated the discussion about the murder that followed the request for counsel. With this failure, it might be difficult to find that the state court's decision was objectively reasonable under *Edwards*. *See Edwards*, 451 U.S. at 484–85 ("We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused initiates further communication, exchanges, or conversations with the police.").

However, we can still deny Schreane's petition as long as the police-initiated discussion did not "present a serious danger of coercion" and Schreane felt that he could terminate the interrogation and leave. *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). Although *Howes* was not "clearly established federal law" at the time of the state court's opinions, both parties agree that *Howes* is instructive in this case. In *Howes*, the Supreme Court eschewed a bright line rule of determining whether a defendant, who was incarcerated on an unrelated offense, was "in custody" when subjected to questioning for another offense, and instead, the Supreme Court announced factors to consider. The factors include: (1) the location of the questioning; (2) the duration of the questioning; (3) statements made during the questioning; (4) the presence of physical restraints; and (5) the release of the inmate after the questioning. *Id.* at 509.

Applying these factors to this case, we must defer to the state court's determination that Schreane was not in custody for *Miranda* purposes prior to being *Mirandized* because such a determination was not unreasonable. Specifically, three factors weigh in favor of finding that Schreane was not in custody. First, statements made during the questioning show that Schreane was not a suspect during the interrogation. The murder had occurred eight years prior and Schreane had never been questioned. The police officers began the discussion by indicating that

they believed that a "bicycle bandit" had committed the murder. Furthermore, Detective Mathis testified that officers never browbeat Schreane, but instead were "all ears" during the discussion.**²** Second, the lack of physical restraints also weighs in favor of finding that Schreane was not in custody. As the district court noted, "there is no indication that Petitioner was restrained at any point during the questioning." Third, the release of Schreane after questioning is also a factor that weighs in favor of finding that he was not in custody. At the conclusion of the discussion, Schreane was not arrested for his role in the murder, but rather he was released back to Hamilton County Jail—the same jail in which he had been incarcerated prior to the questioning. Schreane was not indicted for the murder until approximately three years after the questioning.

While these three factors weigh in favor of finding that Schreane was not in custody during the questioning, at least one factor weighs against such finding: the duration of the questioning. As the district court noted, the questioning took over four hours before police informed Schreane of his *Miranda* rights. However, the fact that at least one factor weighs against the state court's ruling is not enough. The deference afforded by ADEPA bars granting Schreane relief in this case. *See Simpson*, 651 F. App'x at 355 ("Because some factors suggest that Simpson was in custody on April 24, and others do not, AEDPA bars us from granting Simpson relief on this claim.").

Therefore, the state court's ruling was objectively reasonable in finding that Schreane was not in custody for *Miranda* purposes. An individual who is not in *Miranda* custody "has no constitutional right to counsel." *Malcolm*, 435 F. App'x at 420. The police were not required to provide Schreane an attorney or cease questioning him. Schreane's confession was properly admitted at trial.

---

**²**Schreane argues in his reply brief that the alleged promises made by police should be considered in the "statements made during questioning" prong. While in some cases that may be true, any promises made to Schreane, in this case, provide little insight as to whether he was in custody. For example, police could offer the same promises to an inmate who is not a suspect in order to solve the crime quickly and efficiently.

**II.      Promise of Leniency**

Schreane also argues that his confession was involuntary because it was a product of a promise of leniency.  Specifically, Schreane argues that the police promised to "tell the district attorney's office that Petitioner had cooperated, that they would attempt to secure a transfer for Petitioner from county jail to Silverdale, and that they would allow Petitioner to see his girlfriend."  However, that issue is outside the scope of the COA.

We denied Schreane's motion to expand his COA.  In the order, we "directed . . . a briefing schedule on the claims for which the district court granted a COA: whether Schreane's confession should have been excluded from trial due to the denial of his request for counsel and the length of time he was questioned before police informed him of his *Miranda* rights."  The State is correct in arguing that this issue is outside the scope of the COA; therefore, we will not decide the issue.

        **AFFIRMED**.

_____

**CONCURRENCE**

_____

CLAY, Circuit Judge, concurring.   I concur in Judge Siler's opinion for the Court. I write separately to briefly emphasize two unusual facts in this case that compel us to deny Petitioner Clarence Schreane's request for a writ of habeas corpus.

First, Schreane was never a suspect in Marcus Edwards' murder until he voluntarily contacted the police through a third party and apparently offered to trade information related to the Edwards murder for relief on unrelated charges that he was facing.  *See State v. Schreane*, No. E2005-00520-CCA-R3CD, 2006 WL 891394, at *2 (Tenn. Crim. App. Apr. 5, 2006).  The Edwards case had gone cold for nearly eight years, and Schreane likely would have escaped detection entirely if he had not brought his involvement in the murder to the police's attention. Under these circumstances, as Judge Siler rightly concludes, the Tennessee Court of Criminal Appeals did not unreasonably determine that Schreane was not "in custody" for *Miranda* purposes at the outset of his interview with the police because Schreane initiated the interview. *See* Slip. Op. at 7–8; *see also Edwards v. Arizona*, 451 U.S. 477, 484 (1981) (holding that a suspect is not in custody for *Miranda* purposes when he initiates contact with the police).

Second, Schreane testified before the Tennessee trial court that he asked to speak with an attorney near the outset of his conversation with the police after Detective Mathis "told him he believed 'the bicycle bandit' was responsible for [Edwards'] murder."  *Schreane*, 2006 WL 891394, at *2.  In other words, Schreane asked to speak with counsel shortly into an interview that he initiated after the police had told him that they suspected someone else of the crime, and before Schreane had made any statements inculpating himself.  Thus, at the moment Schreane asked to speak with an attorney, he cannot possibly have been "in custody" for Edwards' murder because the police lacked any inkling that Schreane was involved in the crime.  This may well have been a different case if Schreane had renewed his request for counsel after the conversation had turned to his own involvement in the Edwards murder.

In sum, this case presents an unusual fact pattern where the defendant appears to have been entirely responsible both for: (i) initiating contact with the police; and (ii) causing the police to suspect him of a crime. The police in this case were very nearly bystanders at the beginning of the interview, and had their case against Schreane more or less hand-delivered to them through Schreane's own bungled attempt at bargaining for relief from other charges. The Court's opinion must be understood in this context, and should not be misconstrued as broadly holding that defendants will rarely or never be "in custody" for *Miranda* purposes, without regard to the facts of the matter, when they initiate contact with the police. With these observations, I concur in the Court's opinion.